# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

In re:

TUMBLEWEED TINY HOUSE
COMPANY, INC.,

Debtor.

Case No. 20-11564 KHT
Chapter 7

## ORDER ON CONTEMPT SANCTIONS

THIS MATTER came before the Court on the *Motion of FreedomRoads Holding Company, LLC to Enforce Chapter 11 Plan and to Compel Document Production* (the "Motion to Enforce," docket #673), filed October 18, 2024, by FreedomRoads Holding Company, LLC ("FreedomRoads"), and proceedings and filings subsequent thereto, including hearings held December 4, 2024 (docket #683) and January 17, 2025 (docket #685); a *Supplemental Brief of FreedomRoads Holding Company, LLC in Support of Motion to Enforce Chapter 11 Plan and to Compel Document Production* (the "Supplemental Brief," docket #690); the Court's *Order Granting Motion of Freedom Roads Holding Company, LLC to Enforce Chapter 11 Plan and Compel Document Production*, entered January 30, 2025 (docket #691); a hearing held February 7, 2025 (docket #694), and the Court's *Order Converting Case Under Chapter 11 to Case Under Chapter 7*, entered February 10, 2025 (docket #695); a hearing held April 1, 1025 (docket #740), which set a response date and an evidentiary hearing on the request for contempt sanctions contained in the Supplemental Brief; the *Objection to Motion by FreedomRoads Holding Co. LLC to Hold Steve Weissman in Civil Contempt* (docket #746), filed by Debtor's former principal, Steve Weissman ("Weissman"); the *Reply* thereto (docket #747), filed by FreedomRoads; the *Statement of Uncontested Facts* (docket #750) filed by FreedomRoads and Weissman; and an evidentiary hearing on contempt sanctions, held May 8, 2025. Following the evidentiary hearing, the Court took the matter under advisement. The Court is now prepared to rule and hereby finds and concludes as follows:

## I. FACTUAL AND PROCEDURAL BACKGROUND

Tumbleweed Tiny House Company, Inc. ("Debtor") manufactured and sold tiny house recreational vehicles. In 2007, Weissman became Debtor's President and CEO.

In 2017, Debtor and Weissman appeared on "The Profit," a CNBC show that provided struggling small businesses the opportunity to obtain advice from host Marcus Lemonis, CEO of Camping World, and potential investment in the business. During and after the filming and airing of the show, Debtor borrowed over $2.5 million from FreedomRoads, an affiliate of Camping World. Weissman executed a personal guaranty of the debt and pledged his shares as collateral.

Debtor did not accomplish the expansion discussed on the show, and it filed its Chapter 11 bankruptcy petition on March 4, 2020. FreedomRoads assigned blame to Weissman, and Debtor and Weissman assigned blame to FreedomRoads, Camping World, Lemonis, and others connected with the show.

In 2022, after significant litigation and negotiation and more than two years in Chapter 11, Debtor and FreedomRoads settled on terms for a Chapter 11 plan (the "Plan," docket #587) that facilitated confirmation of the Plan and Debtor's emergence from bankruptcy. Weissman participated in negotiating the settlement terms with FreedomRoads that were included in the Plan.

In relevant part, the Plan punted the then-live dispute between FreedomRoads and Debtor about the validity of FreedomRoads' claim and Debtor's claims against FreedomRoads to another forum, as follows:

> Class 11 (*Contested Unsecured Claim of FreedomRoads Financial, LLC*). The Debtor has filed an objection to the Contested Claim of FreedomRoads Holding Company, LLC ["FR"] with the Bankruptcy Court and has obtained permission to employ special counsel to litigate the validity of FR's Contested Claim against the Debtor and the Debtor's claims against FR outside of Bankruptcy Court. Under this Plan, the Debtor's objection to the FR proof of claim will be deemed withdrawn and the validity of FR's Claim against the Debtor will be litigated or arbitrated outside of Bankruptcy Court, excluding the issue of whether FR is entitled to Post-Petition interest or attorney fees during the pendency of this bankruptcy as a matter of bankruptcy law. In the event the Debtor's claims against FR are successful and it is determined or agreed that the Debtor is not indebted to FR, the Contested Claim of FR will be disallowed in its entirety and FR will receive no distribution under this Plan.
>
> If it is determined or agreed that the Debtor is indebted to FR, the Contested Claim of FR will be Allowed in the agreed amount of (a) $4,318,892.22 including principal, interest, and accrued attorneys' fees as of May 15, 2022, (b) default rate interest calculated at 9.5% accruing from May 16, 2022 through the Effective Date, (c) interest accruing at 6.5% from and after the Effective Date until payment in full of FR's Allowed Claim, and (d) reasonable attorneys' fees through the date of payment in full of FR's Allowed Claim, in each case unless otherwise determined by a third party (including an arbitrator) or agreed by FR. FR will receive its pro rata share of annual distributions to Allowed Unsecured Creditors from the Net Profits Fund until its Allowed Claim is paid in full. In the event the Contested Claim of FR is Allowed in part or in full, the Debtor shall pay the full amount of such Claim prior to the eighth anniversary of the Effective Date. FR will provide the Debtor with a final calculation of its claim amount, as of the Effective Date, on or within one week of the Effective Date.
>
> The Reorganized Debtor, at its discretion, may settle, satisfy, or pay

off any Administrative Claims, Priority Claims, or the Claims of any members of Classes 1-11 at any time after the Effective Date without additional Bankruptcy Court approval.

Plan at 27-28.

The Plan required Debtor to make payments as follows:

> 7.4 *Net Profits Fund.*
>
> On the Effective Date, the Debtor will make a Pro-Rata distribution to the Class 10 and Class 11 claimants in the amount of $250,000.00. On the first anniversary of the Effective Date, and each year thereafter, until the Allowed Claims are paid in full, the Reorganized Debtor shall make a Pro-Rata distribution to the Class 10 and Class 11 claimants of the amount in the Net Profits Fund. In the even[t] the Contested Claim of FR is Allowed, the Allowed amount of such Claim shall be paid-in-full prior to the eighth anniversary of the Effective Date.

Plan at 30. Specific to the claim of FreedomRoads, the Plan provided as follows:

> 10.2 *Contested Claims Escrow*.
>
> From and after the Effective Date, the Reorganized Debtor shall establish an escrow account for the benefit of holders of any Contested Claim and shall deposit into such escrow account cash in an amount equal to the payments which would have been made to the holder of such Contested Claim if it were an Allowed Claim in an amount equal to the lesser of: (i) the amount of the Contested Claim or (ii) the amount in which the Contested Claim shall be estimated by the Bankruptcy Court pursuant to § 502 of the Bankruptcy Code for purposes of allowance, which amount shall constitute and represent the maximum amount in which such claim may ultimately become an Allowed Claim. No payments or distributions shall be made with respect to all or any portion of any Contested Claim pending the entire resolution thereof by Final Order, final arbitration determination, or final settlement agreement.
>
> Pending a determination of the Contested Claim of FR, the amount the Debtor shall reserve and hold for the benefit of FR under this provision of the Plan will be equal to the payments which would have been made to FR if it were an Allowed Claim in Class 11 with treatment as described in Article V herein. Nothing herein shall be interpreted to waive the Debtor's right to challenge and contest FR's entitlement to such amounts in litigation or arbitration. For the avoidance of doubt, FR's Allowed Claim includes postpetition interest and fees as specified in Article V herein. The Debtor has no right to challenge FR's postpetition interest or fees on bankruptcy-

> law grounds but may challenge them under contract or tort law, including, but not limited to, the reasonableness of any fees.

Plan at 32.

The Plan was confirmed by the Court's confirmation order entered September 6, 2022 (the "Confirmation Order," docket #628) and became effective on October 21, 2022. Weissman attended the confirmation hearing and was aware of the confirmed Plan's terms.

Debtor subsequently established an account in the name of Tumbleweed Tiny House Company at JP Morgan Chase Bank, N.A., Account Number 3929157189 (the "189 Account"). The 189 Account did not involve a third-party escrow agent, nor did Debtor or Weissman enter into an escrow agreement with FreedomRoads. Between 2022 and 2024, Debtor deposited over $243,000 in the 189 Account, related to distributions to which FreedomRoads was entitled under the Plan.

On May 22, 2024, following significant proceedings, an arbitrator delivered an interim award indicating FreedomRoads had proven its breach of contract claim against Debtor and Weissman, and Debtor and Weissman had failed to prove their causes of action against FreedomRoads, Camping World, Lemonis, and others. On September 12, 2024, the arbitrator delivered a final award in favor of FreedomRoads against Debtor in the total amount of $9,410,072.75 on the claims for principal, interest, and attorney's fees and costs. Per the Plan, this amount is now the allowed claim of FreedomRoads.

Between the entry of the interim award and the final award, counsel for FreedomRoads contacted counsel for Debtor to request documentation of the amount of distributions to which FreedomRoads was entitled and the amount of funds Debtor was holding. Debtor subsequently provided evidence FreedomRoads was entitled to approximately $243,000 of distributions, but Debtor did not provide evidence it was holding those funds.

Unbeknownst to FreedomRoads, in June, July, and August 2024, Debtor had withdrawn funds from the 189 Account and utilized those funds in operating its business. Weissman authorized and directed other of Debtor's personnel to withdraw funds out of the 189 Account, who then did so. The parties agree that during the relevant timeframe, the month-end balance of the 189 Account was as follows:

- May 2024 – $245,270.29
- June 2024 – $120,272.55
- July 2024 – $2,000.65
- August 2024 – $0.66

On September 20, 2024, FreedomRoads filed a Motion to Reopen Chapter 11 Case (docket #668), which the Court granted by Order entered October 16, 2024 (docket #672). FreedomRoads then filed its Motion to Enforce, which sought an order directing Debtor to take the following actions:

4

(a) to remit to FreedomRoads all sums to which it is entitled under the Plan through the present, (b) to comply going forward with its obligation to make distributions to FreedomRoads from the Debtor's Net Profits, as contemplated by the Plan, and (c) to deliver to FreedomRoads documentation sufficient to support the Debtor's calculation of the Net Profits Fund to date and to continue to do so in connection with future distributions from the Net Profits Fund.

Motion to Enforce at 6. Debtor filed a response (docket #678), arguing FreedomRoads could not obtain the requested relief by motion and was required to file an adversary proceeding. FreedomRoads filed a reply in support of the Court's authority to enter the requested relief without an adversary proceeding (docket #680).

The Court held a preliminary hearing December 4, 2024 (docket #683), at which the Court ordered Debtor to produce certain documents by January 8, 2024. The Court held a further hearing on January 17, 2025 (docket #685), at which the Court directed FreedomRoads to draft a proposed order regarding payment of Debtor's payroll expense and to file a Supplemental Brief.

By Order entered January 30, 2025 (the "January 30 Order," docket #691), the Court granted the Motion to Enforce, ordering as follows:

> The Reorganized Debtor is hereby ordered to cease all further use of cash, any and all funds in deposit accounts (either presently or which may hereafter be collected) and any other cash equivalents which the Reorganized Debtor now has or may hereafter acquire ("Cash and Cash Equivalents"), with the exception that the Reorganized Debtor may use Cash and Cash Equivalents to fund the payroll for the period ending January 17, 2025 in an amount to be reasonably agreed to by Movant based upon information to be obtained from the Reorganized Debtor's payroll service and Reorganized Debtor's counsel may apply any retainer funds on deposit (in the approximate amount of $2,500.00) toward partial payment of counsel's fees through January 17, 2025.

January 30 Order at 1-2.

Shortly before the Court entered the January 30 Order, on January 29, 2025, FreedomRoads filed its Supplemental Brief, in which it stated as follows:

> FreedomRoads respectfully requests that this Court: (a) order the Reorganized Debtor to remit all remaining funds on hand to FreedomRoads and (b) find the Reorganized Debtor and Mr. Weissmann (as its chairman, CEO, and sole shareholder) to be in contempt of the Court's plan confirmation order, with a corresponding fine in the amount of $243,544.89, which is the Reorganized Debtor's calculation of what was owed to FreedomRoads out of the reserve.

Supplemental Brief at 2.

At a scheduled hearing held February 2, 2025, the Court *sua sponte* converted Debtor's case to one under Chapter 7 (docket ##694, 695). The Court ordered Debtor to cease business operations, turn over to the Chapter 7 Trustee all records and property of the estate under its custody and control, file a schedule of all unpaid debts incurred after the commencement of the Chapter 11 case, and file and transmit to the United States Trustee a final report and account. On March 12, 2025, Weissman filed the required statements, schedules, and final report (docket ##720-734).

On April 1, 2025, the Court conducted a status conference (docket #740), at which FreedomRoads asked the Court to impose the contempt sanctions requested in its Supplemental Brief, which FreedomRoads asserted were unopposed. The Court required FreedomRoads to serve Weissman with the Supplemental Brief and set a time within which Weissman could file a response.[1] Weissman filed his response (docket #746), FreedomRoads filed its Reply (docket #747), and the parties filed a Statement of Uncontested Facts (docket #750). The Court held an evidentiary hearing at which Weissman testified under oath and exhibits 1-11 and A-H were admitted by stipulation.

## II.    DISCUSSION

This Court has statutory authority to impose a civil contempt sanction under 11 U.S.C. § 105. *In re Skinner*, 917 F.2d 444, 448 (10th Cir. 1990). As the U.S. District Court for the District of Colorado has held:

> To be held in contempt, a court must find (1) the party violated a specific and definite court order; (2) the party had notice of the order; and (3) the party did in fact violate the order. *In re Lucre Management Group, L.L.C.*, 365 F.3d 874, 875 (10th Cir.2004); *Consumers Gas & Oil, Inc. v. Farmland Industries, Inc.*, 84 F.3d 367, 371 (10th Cir.1996). "Whether a contempt is civil or criminal turns on the character and purpose of the sanction involved. Thus, a contempt sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *In re Lucre Management Group, L.L.C.*, 365 F.3d at 877 (internal quotations and citations omitted). "In civil contempt, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus

---

[1] *See U.S. Sec. and Exch. Comm'n v. Hyatt*, 621 F.3d 687, 694 (7th Cir. 2010) (vacating contempt order where district court did not provide nonparty with notice it would be considering the merits of the contempt issue, because "[d]ue process requires that a person facing contempt sanctions be given adequate notice and fair opportunity to be heard in civil contempt proceedings") (citation omitted), and C. A. Wright, A. R. Miller, M. K. Kane & R. L. Marcus, 9A *Federal Practice and Procedure Civ.* § 2465 (3d ed.) (2012) ("[D]ue process does require that any civil contemnor be given certain basic procedural protections before being subject to any sanction: adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner."), *cited in Williams v. Curtis*, No. CV 12-0716 MCA/LAM, 2012 WL 13071889, at *1 (D.N.M. Nov. 19, 2012).

> carries the keys of his prison in his own pockets." *Id.* However, "a completed act of disobedience that the contemnor cannot avoid is criminal in nature." *Id.*

*In re Van Vleet*, 461 B.R. 62, 69 (D. Colo. 2010).

The parties disagree as to whether the Confirmation Order is enforceable by contempt sanctions. Weissman argues plan confirmation creates a contract, enforcement of which is limited to remedies for breach of contract. The Court does not find its contempt power to be so limited. While contempt is often considered in connection with an injunction, *see, e.g., Taggart v. Lorenzen*, 587 U.S. 554 (2019) (considering contempt sanctions issued for violation of a discharge injunction), any order imposing obligations sufficiently specific and definite may be enforced through contempt proceedings. *See, e.g., In re Lucre Management Group, LLC*, 365 F.3d 874 (10th Cir. 2004) (affirming contempt sanctions imposed for violation of an order granting motion to excuse turnover by custodian); *In re Van Vleet*, 461 B.R. at 66, 69-70 (affirming contempt sanctions imposed for violation of orders granting the Chapter 7 Trustee authority and control over the estate's assets).

The Court finds the Plan and Confirmation Order imposed a specific, definite obligation on Debtor to hold payments in escrow:

- Paragraph 7.3 provides: "Payments to creditors holding Contested Claims as provided in Article X herein shall be held in escrow."
- Paragraph 10.1 provides: "Upon the filing of such objection or service of said written notice, such claim shall be considered a Contested Claim, and any cash or other instruments or property otherwise distributable to such creditor under this Plan shall be held by the Reorganized Debtor in escrow until final disposition of the objection to the claim either by settlement or entry of a Final Order."
- Paragraph 10.2, entitled "Contested Claims Escrow," provides: "From and after the Effective Date, the Reorganized Debtor shall establish an escrow account for the benefit of holders of any Contested Claim and shall deposit into such escrow account cash in an amount equal to the payments which would have been made to the holder of such Contested Claim if it were an Allowed Claim," and further provides: "Pending a determination of the Contested Claim of FR, the amount the Debtor shall reserve and hold for the benefit of FR under this provision of the Plan will be equal to the payments which would have been made to FR if it were an Allowed Claim in Class 11 with treatment as described in Article V herein."

Debtor's duty to hold funds in escrow was sufficiently specific and definite to be enforceable by contempt sanctions. *See, e.g., In re Lucre Management Group*, 365 F.3d at 875 ("Here, the bankruptcy court entered a specific order requiring that rents 'are to be used solely to pay expenses of the properties' pursuant to *Morning Star*. . . . Thus, it is clear that Lucre had notice that it was under an unequivocal court order not to use rents to pay the administrative costs of its bankruptcy."). Debtor had knowledge of the Plan and

7

the Confirmation Order and its requirements that the funds be held in escrow. Debtor acknowledged this obligation when it created the 189 Account and placed funds into it, and Debtor violated the Confirmation Order when it failed to maintain the funds in the 189 Account.

It is less clear that the Plan and the Confirmation Order imposed a specific, definite obligation on Weissman. He was not appointed as an escrow agent, and no specific escrow responsibilities were assigned to him. To be sure, he was aware of the Plan and the Confirmation Order and the requirement to maintain funds in escrow. And, a corporation can act only through individual representatives, such as its officers. But, for purposes of contempt, the Court draws a distinction between an order imposing specific, definite duties on a company and an order imposing specific, definite duties on an officer of the company. This is not to say contempt sanctions can never be imposed on officers who cause a company to violate a court order. The Court can certainly envision instances in which contempt sanctions may be imposed appropriately on corporate officers or other individual actors. But considering all the facts before it in this case, the Court cannot find Weissman's actions constituted contempt.

In *Taggart v. Lorenzen*, the Supreme Court held a bankruptcy court's authority to hold parties in contempt was not unlimited, and "the bankruptcy statutes incorporate the traditional standards in equity practice for determining when a party may be held in civil contempt for violating an injunction." 587 U.S. at 560-61. As that Court further held:

> In cases outside the bankruptcy context, we have said that civil contempt "should not be resorted to where there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct." *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885) (emphasis added). This standard reflects the fact that civil contempt is a "severe remedy," *ibid*., and that principles of "basic fairness requir[e] that those enjoined receive explicit notice" of "what conduct is outlawed" before being held in civil contempt, *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) (per curiam). *See Longshoremen, supra*, at 76, 88 S.Ct. 201 (noting that civil contempt usually is not appropriate unless "those who must obey" an order "will know what the court intends to require and what it means to forbid"); 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2960, pp. 430-431 (2013) (suggesting that civil contempt may be improper if a party's attempt at compliance was "reasonable").
>
> This standard is generally an objective one. We have explained before that a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable. As we said in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949), "[t]he absence of wilfulness does not relieve from civil contempt." *Id*., at 191, 69 S.Ct. 497.

> We have not held, however, that subjective intent is always irrelevant. Our cases suggest, for example, that civil contempt sanctions may be warranted when a party acts in bad faith. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Thus, in *McComb*, we explained that a party's "record of continuing and persistent violations" and "persistent contumacy" justified placing "the burden of any uncertainty in the decree ... on [the] shoulders" of the party who violated the court order. 336 U.S. at 192-193, 69 S.Ct. 497. On the flip side of the coin, a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction. *Cf. Young v. United States ex rel. Vuitton et Fils S. A.*, 481 U.S. 787, 801, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) ("[O]nly the least possible power adequate to the end proposed should be used in contempt cases" (quotation altered)).
>
> These traditional civil contempt principles apply straightforwardly to the bankruptcy [ ] context.

*Id.* at 561-62.

Applying those standards, the Court considers the subjective and objective wrongfulness of Weissman's actions. Weissman was aware of Debtor's obligation to hold funds in escrow, but after consulting with experienced bankruptcy counsel who had also participated in drafting the Plan and obtaining its confirmation, Weissman believed the use of funds for Debtor's business expenses did not violate the Court's orders. Advice of counsel does not, itself, preclude a contempt finding, but here, considering all the facts before it, including the lack of specific escrow obligations applicable to Weissman and the use of the funds for Debtor's business expenses rather than for Weissman's personal enrichment, the Court cannot find Weissman's actions to be sufficiently wrongful to constitute contempt.

Even if the Court were to find Weissman in contempt, the Court would not find it appropriate to award a fine in the amount of $243,544.89, as requested by FreedomRoads. Imposing a fine of any amount as a punishment for completed conduct could be considered criminal contempt. And here, after the entry of this Court's January 30 Order, and especially after conversion of Debtor's case to one under Chapter 7, Weissman no longer had the ability to apply Debtor's funds toward payment of its obligation to FreedomRoads. He would not be able to purge any contempt through his own actions, and as such, he would not carry "the keys of his prison in his own pockets," a factor that supports a characterization of a sanction as criminal, rather than civil, contempt. *See In re Van Vleet*, 461 B.R. at 69. This Court does not have the authority to enter criminal contempt sanctions.

Even if the Court were to find FreedomRoads entitled to $243,544.89 as compensation for its loss, the Court cannot find it appropriate to require Weissman, individually, to provide that compensation. The funds removed from the 189 Account were used to pay Debtor's business obligations, not to enrich Weissman personally. Requiring Weissman to pay FreedomRoads would effectively rob Peter to pay Paul. The Court

cannot find equitable principles support that result, particularly given the factors discussed above. Accordingly, the Court will not impose contempt sanctions on Weissman.

Finally, for the avoidance of doubt, the Court finds it inappropriate to impose contempt sanctions on Debtor, given the Court's order converting Debtor's case to one under Chapter 7.

### III.  CONCLUSION

For the reasons discussed above, the Court denies the request of FreedomRoads to impose contempt sanctions on Debtor or Weissman.

Accordingly,

IT IS HEREBY ORDERED that the request for sanctions contained in the Supplemental Brief is DENIED.

Dated July 3, 2025

BY THE COURT:

Kimberley H. Tyson
United States Bankruptcy Judge